IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | <u>UNDER SEAL</u> |
| ENOEL COMSTI, | |
| a/k/a EJ, | Case No. 1:21-mj-223 |
| *Defendant.* | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Brandon G. Strait, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      This affidavit is being submitted in support of an application for a criminal complaint and arrest warrant for ENOEL COMSTI, a/k/a EJ.  I submit that the evidence described in this affidavit establishes probable cause to believe that, on or about August 9, 2020, within the Eastern District of Virginia, COMSTI tampered with evidence, and aided and abetted the same, in violation of Title 18, United States Code, Sections 1512(c) and 2.

2.      This affidavit is for the limited purpose of obtaining a criminal complaint and an arrest warrant.  The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

### AFFIANT'S EXPERIENCE

3.      I am a duly appointed Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since January 2006.  I am currently assigned to CR-14 of the Washington Field Office's Criminal Investigative Division and primarily investigate drug

diversions. As an FBI Special Agent, I have received extensive training in the enforcement of the criminal laws of the United States, as well as extensive training in criminal investigations. I have conducted and participated in numerous investigations involving unlawful narcotics diversion and distribution. During these investigations, I have been involved in the application for and execution of many arrest and search warrants for narcotics related offenses, resulting in the arrest, prosecution, and conviction of numerous individuals, and the seizure of controlled substances, illegal drug proceeds, and other evidence of criminal activity. Through my training and experience, I am familiar with the use, effects, and methods of distribution of controlled substances.

4. The facts and information contained in this affidavit are based on my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, interviews, cell phone downloads, results of search warrants, administrative subpoenas, and other physical evidence obtained during the course of this investigation.

## BACKGROUND

5. Since August 2020, investigators from the Fairfax County Police Department ("FCPD") and subsequently the FBI have been investigating the events which led to the fatal overdose of a female, hereinafter referred to as "Victim-1," on August 9, 2020. Victim-1 resided in Los Angeles, California prior to her death. On August 8 and 9, 2020, however, Victim-1 was in Fairfax County within the Eastern District of Virginia visiting her friend, hereinafter referred to

as "Unindicted Co-Conspirator-1" ("UCC-1")[1] when she fatally overdosed at UCC-1 's residence located on the 9000 block of Peach Blossom Trail in Lorton, Virginia.

6.  Based on an autopsy that was conducted on Victim-1, and according to the medical examiner's report dated September 28, 2020, Victim-1's cause of death was identified as "fentanyl intoxication."

7.  Fentanyl is a powerful synthetic opioid which is 50 to 100 times stronger than morphine. The Drug Enforcement Administration ("DEA") classifies fentanyl as a Schedule II controlled substance. As such, fentanyl has a high potential for abuse, with use potentially leading to severe psychological or physical dependence. Medical practitioners use fentanyl to treat patients with severe pain and/or manage pain after surgical procedures. Fentanyl is also used to treat chronic pain patients who have developed tolerance to other opioids.

8.  Alprazolam, commonly known as the brand name "Xanax," is a prescription medicine used to treat anxiety disorders, depression, and panic disorders. The DEA classifies Alprazolam as a Schedule IV controlled substance.

9.  I am aware that counterfeit prescription drugs are sold on the dark web. I am also aware that for those seeking to obtain Xanax in a non-traditional setting (i.e., a medical office visit), Xanax can be purchased on the dark web among other places. Counterfeit prescription drugs may contain mixtures of non-pharmaceutical substances that are laced with fentanyl. These fentanyl-laced substances are pressed into pills which bear the traditional markings of legitimate prescription pills such as Xanax pills, or "bars" which is a slang term for the pills because of their shape. This often makes it difficult for purchasers to know if the Xanax "bars" they have obtained

---

[1] UCC-1 is referred to herein in the masculine regardless of true gender.

are legitimate prescription medication or counterfeit pills. Consuming counterfeit Xanax laced with fentanyl can lead to death.

10. Heroin is an illegal, highly addictive drug processed from morphine, a naturally occurring substance extracted from the seed pod of certain poppy plants. The DEA classifies heroin as a Schedule I controlled substance. Heroin can be a white or brown powder, or a black sticky substance known as black tar heroin. Heroin is routinely introduced into the body via snorting, smoking and/or injecting. Based on my experience working on similar investigations, "heroin" may be laced or replaced with fentanyl. Fentanyl-laced heroin has contributed to the recent increase in overdose deaths locally.

## SUMMARY OF PROBABLE CAUSE

### Date of Victim-1's Death – August 9, 2020

7. On August 9, 2020, at approximately 5:51 p.m., UCC-1 telephonically contacted 911 emergency dispatch requesting an ambulance at his residence and he stated Victim-1 was not waking up. UCC-1 told the dispatcher that he could not tell if Victim-1 was breathing and indicated that it appeared that Victim-1 was biting her tongue. UCC-1 told the dispatcher that he believed Victim-1 may be diabetic and confirmed to dispatch that it was possible Victim-1 was having a diabetic emergency. UCC-1 denied Victim-1 using alcohol and/or drugs, but stated that she had smoked weed "here and there." After being questioned by dispatch, UCC-1 denied that there was a possibility that Victim-1 had overdosed.

8. Investigators arrived on the scene and interviewed UCC-1. UCC-1 informed investigators that the previous day, August 8, 2020, he picked up Victim-1 from Baltimore/Washington International Thurgood Marshall Airport at around 8:00 p.m. UCC-1 stated he then brought her back to his residence where they watched movies until approximately 3:00

a.m. on August 9, 2020, at which time Victim-1 went to sleep.  UCC-1 stated that he checked on Victim-1 in the early afternoon of August 9, 2020 and believed she was still sleeping.  Later in the afternoon, he checked on her again and found her unresponsive.  UCC-1 indicated that Victim-1 was a religious person and did not drink or do drugs to his knowledge.

9.      While at the scene, investigators found and seized Victim-1's cell phone and were able to unlock the device using the four digits corresponding to Victim-1's birth month and day, "0810."  Investigators reviewed the contents of text messages between Victim-1 and UCC-1. Based on messages exchanged between the two parties, law enforcement was able to determine that UCC-1 utilized telephone number 202-***-8268 which was saved in Victim-1's telephone under a name commonly used by UCC-1.  Messages between Victim-1 and UCC-1 were exchanged in the days leading up to Victim-1's death, and messages in Victim-1's phone between UCC-1 and Victim-1 went back as far as May 8, 2020.

10.      In the text messages leading up to Victim-1's visit to Virginia, UCC-1 talked with Victim-1 about obtaining various narcotics, including "X" (Ecstasy), Acid, Xanax, "Molls" (Molly or MDMA), and "H" (Heroin).  After investigators confronted UCC-1 with the contents of the text messages, UCC-1 stated that he knew "it look[ed] bad," but indicated that there would not be any illegal substances in Victim-1's system.

11.      Items seized during the search of UCC-1's residence included UCC-1's cell phone, Naloxone,[2] a device for administering Narcan known as a Narcan plunger, and other drug paraphernalia.

---

[2] Naloxone, widely known as the common brand name "Narcan," is a medication which is used to block the effects of opioids by countering the decrease in breathing by those who have overdosed on opioid narcotics.  Narcan is generally prescribed to patients who have known addictions to opioids.  Narcan is generally administered nasally or via muscle injections.

### Analysis of Victim-1's Cell Phone

12.  On August 10, 2020, Victim-1's cell phone, which utilized telephone number 213-***-0806, was forensically extracted and analyzed by investigators from FCPD.  Analysis of the extraction revealed extensive conversations between Victim-1 and UCC-1.  In these messages the two parties discussed different drugs Victim-1 wanted UCC-1 to obtain in anticipation of her visit to Virginia for her birthday which was August 10.  In part, the following conversation took place on July 6, 2020:

| | |
|---|---|
| **Victim-1:** | So when I come over on my bday I want you to get me something |
| **Victim-1:** | I need you to find out the prices for |
| **UCC-1:** | Anything |
| **Victim-1:** | Ecstacy pills/shroomms/acid |
| **Victim-1:** | Lmao |
| **UCC-1:** | Really? Lol |
| **Victim-1:** | Yup |
| **UCC-1:** | I got acid already.  I have two tabs |
| **Victim-1:** | I also wanna try one of those pills that Gia gets stupid on |
| **Victim-1:** | I wanna see the hype of that pill |
| **UCC-1:** | I was saving one for Gia but…. |
| **Victim-1:** | Lmao |
| **Victim-1:** | Nah Gia dont need it |
| **UCC-1:** | It doesn't look like it's gonna happen |
| **Victim-1:** | Save it for my bday |
| **UCC-1:** | I would love to try it with you MY FIRST TIME |
| **Victim-1:** | What other drugs are safe to use? Lol |
| **UCC-1:** | Have you ever try acid? |
| **UCC-1:** | I know you did the other two things |
| **UCC-1:** | Oxy that's like baby???? H lol |
| **Victim-1:** | Okay 1 pill of those |
| **Victim-1:** | I am going to try all those small drugs |
| **Victim-1:** | No hard drugs |
| **Victim-1:** | No H |
| **UCC-1:** | Lol okay but we have to spread them out |
| **Victim-1:** | No Coke |
| **UCC-1:** | I wouldn't let you try H |
| **Victim-1:** | Good |
| **UCC-1:** | Coke maybe but definitely not cr@ck |
| **Victim-1:** | Nope |
| **Victim-1:** | Coke maybe |

| | |
|---|---|
| **Victim-1:** | Just a small hit |
| **UCC-1:** | When you get, you'll know what you want to try and what you don't wanna try |
| **Victim-1:** | What else can you get? |
| **UCC-1:** | I can get anything if you give me a heads up lol |
| **Victim-1:** | Idk what else is there lol |
| **UCC-1:** | Lately I've just been getting everything off the internet tbh lol |
| **Victim-1:** | 1. 1 ecstacy pill/1 Molly 2. Acid 3. Shrooms 4. Oxy 5 |
| **Victim-1:** | Internet o.o |
| **UCC-1:** | You wanna try 5 things? |
| **Victim-1:** | Yeah 5 |
| **UCC-1:** | Internet is usually safer (IF U KNOW WHAT YOUR DOING) |
| **Victim-1:** | 6 cuz coke too. |

13.     UCC-1 further told Victim-1 that he believed he could purchase everything for less than $100 and continued to talk about the prices of different drugs.  UCC-1 sent the following message to Victim-1 on July 6, 2020: "1. ecstasy 2. Shrooms 3. Acid (check/got it) 4. Oxy 5. Coke (check/got it) 6. Bars/Xanax (check/got it)."

14.     On August 7, 2020, UCC-1 and Victim-1 engaged in text communications regarding drugs and UCC-1 told Victim-1 the order in which they should take the drugs.  UCC-1 sent the following text message to Victim-1: "I might order some more acid.  I'm thinking we do acid first, then Xanax, the x or molls….or it doesn't matter the order lol maybe do acid twice or nah? Maybe I'll get shrooms but I hear it taste nasty."  Victim-1 replied "Umm I don't like the trip of shrooms," to which UCC-1 responded, "You like edibles? All of those are SUPER STRONG. Got those, the acid, the Xanax, the [emoji], the h which I'm not letting you do lol.  I'm just missing the x or molls."

15.     During the course of their conversations in the month leading up to Victim-1's visit to Virginia and eventual death, UCC-1 identified a number of individuals whom he had, or could, purchase various drugs from.

### Analysis of UCC-1's Phone

16.     On August 17, 2020, a magistrate judge in Fairfax County in the Commonwealth of Virginia authorized a search warrant for UCC-1's cell phone seized from him on August 9, 2020.  On that same date, investigators performed a forensic extraction of the phone.  After reviewing the forensic extraction, investigators identified a male (this identified male will be hereinafter referred to as "IM-1"), utilizing telephone number 571-***-3004, and COMSTI, utilizing telephone number 571-***-6140, as two individuals who had significant telephonic and text message conversations with UCC-1 on the day of Victim-1's death.

17.     Review of the forensic extraction revealed a conversation between IM-1 and UCC-1 in which UCC-1 asked IM-1 if one can overdose on "bars."  As noted above, "bars" can be a slang for Xanax pills.  At approximately 3:27 p.m., approximately two hours and twenty-four minutes before UCC-1 called 911 dispatch, IM-1 and UCC-1 had the following exchange:

| UCC-1: | Can u od |
|--------|----------|
| IM-1: | I was gonna go while she was in the shower |
| UCC-1: | From bars? |
| IM-1: | Takes a lot |
| IM-1: | Like 5-8 |
| UCC-1: | My only had half a bar |
| UCC-1: | My friend only had half a bar |
| UCC-1: | But it was her first time |
| IM-1: | Damn I use to pop like 3 |
| UCC-1: | She not working up tho |
| IM-1: | I would just take cold shower to get up in the morning |
| UCC-1: | I'm worry |
| IM-1: | Is she breathing |

18.     The review of the forensic extraction also revealed that COMSTI met with UCC-1 on August 9, 2020 prior to UCC-1 calling 911 dispatch.  At approximately 4:17 p.m. on August 9,

2020, UCC-1 called COMSTI. At approximately 4:22 p.m., approximately 1 hour and 29 minutes before UCC-1 called 911 dispatch, COMSTI texted UCC-1 that he was on his way. UCC-1 asked for an "eta" and COMSTI replied "14 min."

19.     Between approximately 4:17 p.m. and 8:55 p.m. on August 9, 2020, UCC-1 and COMSTI engaged in text conversations. In these messages, UCC-1 acknowledged Victim-1's death, COMSTI coached UCC-1 on what to tell police to avoid "self incriminating [him]self," and the two parties discussed removing drug paraphernalia from UCC-1's residence prior to police arriving.

20.     At approximately 5:37 p.m. on August 9, 2020, UCC-1 wrote to COMSTI "Why is this happening smfh." I know that "smfh" is shorthand slang for "shaking my fucking head." At approximately 5:54 p.m., COMSTI wrote, "I donat know shoot man umm not a doctor." Later in the evening, at approximately 8:44 p.m., UCC-1 wrote, "It is all my faulth tho." UCC-1 then sent, "Why canat I ever be the one 2 die."

21.     At approximately 8:05 p.m. on August 9, 2020, after UCC-1 had initially spoken with police, the following text conversation took place between UCC-1 and COMSTI:

| UCC-1: | The said they need me cuz they need to question me more smfh |
| COMSTI: | I woke up, she was dead, thatas all I know |
| COMSTI: | Say it and do NOT offer any more potential information further than that. |
| COMSTI: | ANY thin more than that is potentially self incriminating yourself. |

22.     At approximately 8:10 p.m. on August 9, 2020, UCC-1 sent COMSTI the following text message: "The thing I forgot I miss is a crack pipe but everything I know I got rid of."

23.     At approximately 8:55 p.m. on August 9, 2020, COMSTI sent UCC-1 the following text messages: "Man why did you call me out here instead of an ambulance?" "I got nothing out of this except soaked in rain water, sweat, stressed, two flat tires and two pinches of dirt to shoot."

I know that "two pinches of dirt to shoot" refers to heroin. Based on an interview with COMSTI described in further detail below, on August 9, 2020 UCC-1 provided COMSTI with heroin as payment for assisting UCC-1 with cleaning up the scene of Victim-1's death earlier that day.

**Interview of COMSTI**

24.     On January 6, 2021, investigators conducted a consensual interview of COMSTI regarding the events which transpired on August 9, 2020. COMSTI recalled receiving a phone call from UCC-1 and being told by UCC-1 that he could not tell if Victim-1 was breathing and that UCC-1 needed help. UCC-1 told COMSTI that he (UCC-1) had given Victim-1 a Xanax bar but did not think that Xanax would have had that type of effect on Victim-1.

25.     COMSTI indicated that UCC-1 called him as opposed to someone else because UCC-1 thought of COMSTI as "some type of doctor," because COMSTI had previously administered Narcan to another female who had overdosed at UCC-1's residence. COMSTI stated that he could not tell if Victim-1 was breathing and that he gave Victim-1 Narcan but it became evident to COMSTI that Victim-1 was already dead.

26.     After COMSTI administered the Narcan without positive effects, UCC-1 attempted to clean up the residence of all drugs and drug paraphernalia. COMSTI believed that UCC-1 took the paraphernalia out of the residence in the pocket of UCC-1's pants. COMSTI then started to drive UCC-1 to a storage unit but COMSTI's vehicle got two flat tires within walking distance of the facility before arriving. COMSTI believed UCC-1 used that storage unit to stash drugs and drug paraphernalia that UCC-1 had taken from the residence.

27.     COMSTI explained that UCC-1 was his dealer of heroin for a period of time and that, in exchange for COMSTI's help on August 9, 2020, UCC-1 provided him with heroin as payment.

## CONCLUSION

28.      Based upon the foregoing, I submit that there is probable cause to believe that on or about August 9, 2020, within the Eastern District of Virginia, the defendant, ENOEL COMSTI corruptly altered or concealed and attempted to alter or conceal an object with the intent to impair the object's integrity and availability for use in an official proceeding, to wit: the body of Victim-1 and drugs and drug paraphernalia, and aided and abetted the same, in violation of Title 18, United States Code, Sections 1512(c) and 2.

29.      Wherefore, I respectfully request that this Court issue a criminal complaint charging ENOEL COMSTI with violation of 18 U.S.C. §§ 1512(c) and 2, and a warrant authorizing his arrest.

Respectfully submitted,

Brandon Strait
Special Agent
Federal Bureau of Investigation

Sworn and subscribed in accordance with the
requirements of Fed. R. Crim P. 4.1 via
telephone to me this 2nd day of July, 2021.

John F.
Anderson

Digitally signed by John F.
Anderson
Date: 2021.07.02 11:03:16
-04'00'

The Honorable John F. Anderson
United States Magistrate Judge

11